**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CYNTHIA DAWN COLLINS,**

   **Plaintiff,**

**v.**           **Case No.: 3:19-cv-00824**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**

   **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATIONS**</u>

This action seeks a review of the decision of the Commissioner of the Social Security Administration *(*hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 12, 16).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for

judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On June 28, 2016, Cynthia Dawn Collins ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of December 13, 2015 due to "arthritis, PTSD, bulging disc, sciatica, bursitis – both hips, high blood pressure, [and] high cholesterol." (Tr. at 283-91, 323). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 56). Claimant then filed a request for an administrative hearing, which was held on October 15, 2018 before the Honorable Maria Hodges, Administrative Law Judge. (Tr. at 74-109). By written decision dated October 29, 2018, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 53-73). The ALJ's decision became the final decision of the Commissioner on September 26, 2019 when the Appeals Council denied Claimant's request for review. (Tr. 8-14).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 12, 16). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 48 years old on her alleged onset date and 51 years old on the date of the ALJ's decision. (Tr. at 65). She completed high school and some college courses,

and she previously worked as a retail cashier, service dispatcher for a garage door company, personal scheduler for a health care company, customer service representative for telephone providers, mortgage accounting clerk, supply clerk in a nursing home, and camp rental clerk. (Tr. at 79, 106).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from

the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2021. (Tr. at 59, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 13, 2015, the alleged disability

onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: degenerative disc disease, bursitis, post-traumatic stress disorder (PTSD), and generalized anxiety disorder. (*Id.*, Finding No. 3). The ALJ considered Claimant's hypertension, type 2 diabetes mellitus, and obesity, but found that the impairments were non-severe. (Tr. at 59).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 60-61, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; should avoid concentrated exposure to temperature extremes, vibrations, and hazards of moving machinery and unprotected heights; can understand, remember, and carry out detailed, but not complex, instructions; with occasional and superficial contact with the public.

(Tr. at 61-64, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 64-65, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 65-66, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1966 and was defined as a younger individual on the alleged disability onset date, but she subsequently changed age category to an individual closely approaching advanced age; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational

6

Rules supported a finding that Claimant was "not disabled," regardless of Claimant's transferable job skills. (Tr. at 65, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including unskilled work as a routing clerk or office helper at the light exertional level or table worker or sorter at the sedentary exertional level. (Tr. at 65-66, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 66, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts four challenges to the Commissioner's decision. She contends that the ALJ failed to (1) develop the record; (2) perform any credibility determination to evaluate her pain and the side effects of her medication; (3) consider her impairments in combination; or (4) produce evidence "to rebut the presumption of disability." (ECF No. 12 at 9-13).

In response to Claimant's challenges, the Commissioner argues that the ALJ performed a function-by-function analysis, pointing to specific examination findings and clinical test results that supported the RFC assessment. (ECF No. 16 at 13). He argues that the ALJ specifically considered Claimant's subjective pain complaints, and the ALJ explained why Claimant's allegations were not fully credible given the objective medical evidence, Claimant's daily activities, and the rest of the record. (*Id.* at 16). As to side effects medication, the Commissioner asserts that the ALJ noted Claimant's statement that her medication caused drowsiness, but Claimant does not identify any records, other than her own testimony, that indicated any significant side effects from

medication. (*Id*. at 20). Finally, the Commissioner argues that the ALJ considered Claimant's combination of impairments, and, contrary to Claimant's argument, there is no such thing as a presumption of disability under the Social Security Act. (*Id*. at 21-23).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### A. *Treatment Records*

On July 28, 2015, Claimant asked her primary care physician, Buddy Hurt, D.O., to refer her to a pain clinic. (Tr. at 437). She complained of toothache-like pain in her left lumbar region and hips, which she stated prevented her from sleeping. (*Id*.). On examination, Claimant was tender to palpation along her lumbar muscles, but she did not have any weakness in her lower extremities; her gait, stance, and deep tendon reflexes were normal; and her straight leg raising test was negative. (Tr. at 438). Dr. Hurt referred Claimant for pain management. (*Id*.).

Claimant presented to Michael Patrick Hackman, M.D., for a mental health appointment on October 5, 2015. She was diagnosed with generalized anxiety disorder and PTSD. (Tr. at 483). Claimant stated that she was "doing pretty good," and she had no side effects from medications, which included clonidine and Cymbalta. (Tr. at 482). Claimant was working as a caregiver for an elderly woman with dementia. (*Id*.). Her mood was stable, and her anxiety was "decently well controlled." (*Id*.).

Claimant presented to pain management physician Joseph DeLapa, II, M.D., on November 24, 2015. She stood and walked unassisted with a non-antalgic gait. (Tr. at 604). Her lumbar range of motion was reduced, and she complained of facet column pain, tenderness in her sacroiliac joints, and trigger points in her latissimus dorsi

muscle. (*Id*.). However, her lower extremity movements were unrestricted and non-painful, her reflexes were unimpaired, and her Faber and straight leg sitting tests were negative. (Tr. at 604-05). Dr. DeLapa noted that Claimant's lumbar spine x-ray, which was taken on November 17, 2015, showed no progression of degenerative changes. (Tr. at 604). He diagnosed Claimant with myofascial pain syndrome and lumbar spondylosis, administered trigger point injections, and referred Claimant to a physical therapist. (Tr. at 605).

Claimant followed up with Dr. Hurt on January 12, 2016 regarding hypertension. Her blood pressure was 133/84 after being out of medication for five days. (Tr. at 432). Dr. Hurt renewed Claimant's prescription for chlorthalidone. (Tr. at 434). The next day, Dr. DeLapa administered four trigger point injections in Claimant's hips and lumbar area. (Tr. at 607). On January 27, 2016, Claimant told pain management nurse practitioner, Sherry Perry, that the injections that Dr. DeLapa gave her did not provide any relief, and her symptoms were worse at night. (Tr. at 611, 613). Nurse Perry diagnosed Claimant with lumbar spondylosis and ordered an MRI. (*Id*.).

Claimant presented to Dr. Hackman on February 17, 2016 regarding PTSD and generalized anxiety disorder. Claimant reported that she was doing "good," was working at InfoCision for the past few weeks, and quit smoking. (Tr. at 429). Claimant told Dr. Hackman that she only needed to take clonidine every once in a while. (*Id*.). Her mood was stable, and she denied depression. (*Id*.). Claimant followed up with Nurse Perry on April 14, 2016. Claimant had muscle weakness with resistance during straight leg raising test, but no neurological compromise; she stood and walked unassisted with a non-antalgic gait; and her blood pressure was 124/84. (Tr. at 457-58). Nurse Perry again diagnosed Claimant with lumbar spondylosis and ordered an MRI. (Tr. at 458). On May

26, 2016, Nurse Perry noted that Claimant's MRI showed a small disc bulge at L2-3 with mild arthropathy and moderate facet arthropathy and ligament flavum hypertrophy at L4-5. (Tr. at 620). She diagnosed Claimant with greater trochanteric bursitis and ordered pretrochanteric bursa injections, which Dr. DeLapa administered on July 18, 2016 and August 1, 2016. (Tr. at 620-22, 624-25).

Claimant told Nurse Perry on August 15, 2016 that she fell on her left side two weeks earlier, twisting her body as she fell, and now had increased right hip pain. (Tr. at 627, 629). Claimant stood and walked unassisted with non-antalgic gait, but her modified Gaenslen test was positive on the left[1] and her right sacroiliac joint was tender. (Tr. at 628-29). Nurse Perry diagnosed Claimant with sacroiliac joint dysfunction. (*Id.*). She administered a Toradol injection, and ordered a left sacroiliac joint injection, which Dr. DeLapa administered on October 6, 2016. (Tr. at 629, 630).

On October 20, 2016, Claimant told Nurse Perry that her pain was worse since her left sacroiliac joint injection. (Tr. at 568). She stated that the pain radiated down her left buttock and the back of her leg to her knee, which it did not do previously, and her back pain was not improved at all. (*Id.*). Claimant still stood and walked unassisted with a non-antalgic gait. (Tr. at 569). Nurse Perry administered Depo-Medrol and Toradol shots. (Tr. at 570).

Claimant presented to nurse practitioner, David Morris, on October 31, 2016 regarding hypertension, and she also reported two episodes of low blood glucose, stating that she went long periods without eating. (Tr. at 549). Claimant's blood pressure was 142/81. (Tr. at 551). Nurse Morris diagnosed Claimant with type 2 diabetes without

---

[1] "Gaenslen's Test is one of the five provocation tests that can be used to detect musculoskeletal abnormalities and primary-chronic inflammation of the lumbar vertebrae and Sacroiliac joint (SIJ)." https://www.physio-pedia.com/Gaenslen_Test

complications for which he ordered blood tests and blood glucose test strips, PTSD for which he prescribed clonidine at bedtime, and hypertension for which he prescribed chlorthalidone. (Tr. at 551-52). Nurse Morris instructed Claimant to eat a more balanced diet, and he gave her handouts regarding hypoglycemia. (Tr. at 552). Claimant was instructed to return for follow up in one year. (*Id.*).

On November 28, 2016, Claimant presented to pain management nurse practitioner, Breanna Whitmore, regarding pain in her left buttock, back, and leg. (Tr. at 564). She again stated that the left sacroiliac joint injection provided no pain relief. (Tr. at 566). Claimant participated in physical therapy for four to six weeks, performed her home exercise program, and took nonsteroidal anti-inflammatory drugs. (*Id.*). On examination, Claimant had facet column pain and tenderness at L3-5, but her blood pressure was 133/83; she stood and walked unassisted with a non-antalgic gait; she denied radicular pain; and her imaging did not show any herniated discs. (Tr. at 565-66). Nurse Whitmore diagnosed Claimant with lumbar spondylosis, sacroiliac joint dysfunction on the left side, and greater trochanteric bursitis. (*Id.*). She ordered a facet nerve block at L3-5. (*Id.*).

On January 9, 2017, Dr. DeLapa administered a left facet nerve block at L3-5 to treat Claimant's lumbar spondylosis (Tr. at 640). Claimant followed up with Nurse Whitmore on January 23, 2017, stating that the nerve block provided 75 percent pain relief for one and one-half days. (Tr. at 646). Nurse Whitmore ordered lumbar radiofrequency treatments, and Dr. DeLapa performed a left facet rhizotomy at L3-5 on March 8, 2017. (Tr. at 646, 647). Claimant told Nurse Whitmore on April 11, 2017 that she had pain relief from the radiofrequency therapy, but her hips were still her primary source of pain. (Tr. at 658). On examination, Claimant was tender around her hip joints.

(*Id*.). Nurse Whitmore ordered hip x-rays and left hip injections, and she prescribed Robaxin. (*Id*.). Claimant's hip x-rays on April 19, 2017 showed no acute findings, including normal alignment, no fracture, intact joints, and no significant joint space narrowing. (Tr. at 661). Dr. DeLapa administered Claimant's left hip injections on May 11, 2017. (Tr. at 662-63). Claimant reported to Nurse Whitmore on May 25, 2017 that the injections provided 60 percent pain relief, but she still had left hip and low back pain. (Tr. at 669). Claimant still stood and walked unassisted with non-antalgic gait. (Tr. at 668). Nurse Whitmore administered trigger point injections in Claimant's lower back on June 22, 2017. (Tr. at 670-71).

Claimant presented for a mental health intake evaluation at Prestera Center  on July 28, 2017. (Tr. at 583). She said that she was going through menopause and feeling anxious and depressed every day in addition to other symptoms. (*Id*.). On examination, Claimant's sociability was inhibited, and her coping ability was overwhelmed, but her appearance, speech, and thought content were within normal limits; she was fully oriented; and her memory and affect were normal. (Tr. at 578-79). She stated that she got along "okay" with her boyfriend, but they had trouble communicating sometimes, and she had two good friends. (Tr. at 592-93). For fun, Claimant laid in the sun at her pool. (Tr. at 593). The intake counselor, Deborah Eastham, M.A., recommended that Claimant schedule appointments with a counselor and psychiatrist. (Tr. at 594).

On August 8, 2017, Nurse Whitmore recorded that Claimant went to the emergency room a couple of days after her June trigger point injections due to pain. (Tr. at 674). Claimant was prescribed an increased dosage of Robaxin, which she stated, "does help." (*Id*.). Claimant said that the trigger point injections themselves provided no relief. (*Id*.). Nurse Whitmore ordered left sacroiliac joint injections and renewed

Claimant's prescription for a higher dose of Robaxin. (*Id*.). Dr. DeLapa administered the left sacroiliac joint injections on September 20, 2017, and Claimant told Nurse Whitmore on March 6, 2018 that the injections provided greater than 50 percent pain relief for a few months. (Tr. at 675, 719). Claimant's neurological functions remained grossly intact, and she stood and walked unassisted with a non-antalgic gait. (Tr. at 718). Claimant's lumbar spine was not tender to palpation, but she reported tenderness over her left sacroiliac joint. (Tr. at 719). Nurse Whitmore ordered another left sacroiliac joint injection and prescribed Valium. (*Id*.). Claimant's diagnoses included lumbar spondylosis, sacroiliac joint dysfunction, and myofascial pain syndrome. (*Id*.).

On April 10, 2018, Claimant followed up with Nurse Whitmore, stating that her most recent injections for low back and hip pain provided 30 to 40 percent pain relief for a few days, but the pain returned. (Tr. at 724). Claimant was very tender over the left trochanteric bursa, so Nurse Whitmore ordered left trochanteric bursa injections. (*Id*.). Claimant remained grossly intact neurologically, and she stood and walked unassisted with a non-antalgic gait. (Tr. at 723). Claimant told Nurse Whitmore on June 20, 2018 that the left trochanteric burse injection provided 90 percent pain relief. (Tr. at 729). Claimant still had normal neurological functions and gait, but she was tender over her left sacroiliac joint. (Tr. at 728-29). Thus, Nurse Whitmore ordered left sacroiliac joint injections. (Tr. at 728).

### B. Evaluations and Opinions

On August 15, 2016, psychologist Rosemary L. Smith, Psy.D., assessed Claimant's mental RFC based upon her review of Claimant's records. Dr. Smith opined that Claimant had mild restriction in activities of daily living and maintaining concentration, persistence, or pace and moderate limitation in social functioning. (Tr. at 115). She

assessed that Claimant could understand, remember, and carry out detailed instructions, but she could sustain only occasional and superficial contact with the general public. (Tr. at 120). Dr. Smith noted that Claimant could interact without restrictions with those familiar to her, such as co-workers and supervisors. (*Id*.). James Binder, M.D., affirmed this assessment on December 20, 2016. (Tr. at 146, 150-51).

Kip Beard, M.D., performed an Internal Medicine Examination of Claimant on October 19, 2016. Claimant's gait was mildly slow, but she did not use an ambulatory aid. (Tr. at 539). Claimant had minimal difficulty arising from the chair and getting on and off of the examination table. (*Id*.). She reported back pain when she walked on her heels or toes and left hip pain when she stood on one leg (*Id*.). Claimant could squat half-way to the floor. She complained of mild paraspinal tenderness and moderate pain upon range of motion testing. (Tr. at 539, 542). Her seated straight leg raising test was normal, but she claimed that she experienced low back and hip pain at 70 degrees in the supine position. (*Id*.). Claimant's neurological, muscular, and reflexive examinations were normal. (Tr. at 544-45). Dr. Beard stated that, based on his examination, Claimant's "ability to perform physical work-related activities appear[ed] impaired for activities such as repetitive bending, squatting and medium to heavy lifting or carrying." (Tr. at 546).

On October 28, 2016, Pedro F. Lo, M.D., assessed Claimant's physical impairments based on his review of Claimant's records, including Claimant's internal medicine examination. Dr. Lo concluded that Claimant's physical impairments were non-severe, but he found that Claimant was restricted to a reduced range of light work. (Tr. at 115, 117-19). He stated that Claimant should never climb ladders/ropes/scaffolds, balance frequently, and perform all other postural activities occasionally. (Tr. at 118).

14

Dr. Lo noted that Claimant's postural limitations were due to her morbid obesity. (*Id.*). He further opined that Claimant should avoid concentrated exposure to temperature extremes, vibration, and hazards. (Tr. at 118-19). Rabah Boukhemis, M.D., affirmed this assessment on December 20, 2016. (Tr. at 148-49).

On November 19, 2018, licensed professional counselor Michelle Wilburn, M.A., wrote a letter in reference to Claimant's claim for social security benefits. Counselor Wilburn stated that Claimant presented for treatment at Prestera Center on July 28, 2017, reporting symptoms of depression and anxiety, as well as flashbacks regarding physical and sexual abuse, and passive suicidal ideation. (Tr. at 51). Claimant participated in individual therapy, and the frequency of intervention declined over time due to reported and observed improvement in Claimant's symptoms. (*Id.*). Counselor Wilburn stated that Claimant's depressive symptoms were effectively managed and/or in remission, and her anxiety was not nearly as severe. (*Id.*). She recorded that anger was Claimant's main problem, but she was only verbally, not physically, aggressive, and she was working on the issue. (*Id.*). Counselor Wilburn stated that, early in Claimant's treatment, her mental health symptoms were likely disabling, and she was fired from a job because she did not communicate effectively, in part because she thought her supervisor was against her. (Tr. at 52). However, Counselor Wilburn did not believe that Claimant's symptoms significantly impaired her ability to engage in gainful employment any longer. (*Id.*). She noted that Claimant appeared to be in physical pain and uncomfortable during appointments, shifting in her seat, walking slowly and unevenly, and having difficulty sitting down and standing. (*Id.*). However, Counselor Wilburn stated that she was not a medical expert, and it was merely her observation. (*Id.*).

### C. Claimant's Statements

Claimant testified during her administrative hearing on October 15, 2018 that she did not know why she chose December 13, 2015 as her alleged disability onset date, because she worked after that point in time. (Tr. at 79-80). Claimant alleged that she was unable to work because of back and hip pain, which made it hard to walk or climb stairs, and she also did not sleep or concentrate well. (Tr. at 89). Claimant testified that injections provided pain relief for four to six weeks, and then she was in pain until she could have another injection as she was only eligible for injections every four to six months. (*Id*.). She stated that, once her injections wore off, she would fall because her leg gave out. She reportedly fell four times in the past six weeks and was not due for injections until the day after the hearing. (*Id*.). Claimant testified that she also took muscle relaxers, arthritis medication, and slept on a heating pad, which she claimed caused her burn marks, in order to control the pain. (Tr. at 89-90).

During the day, Claimant watched television and alternated between sitting and standing because she was uncomfortable. She sometimes went to Church. (Tr. at 90-95). She did her own laundry, made simple meals, and went grocery shopping. (Tr. at 95, 98). Sometimes a friend accompanied her and helped her carry the groceries, if she needed to buy a lot of items. (Tr. at 95-96). Claimant testified that she had a driver's license, but she only drove five to ten miles at one time because it hurt for her to continue sitting. (Tr. at 96). She broke up with her boyfriend one month earlier, and she began smoking again. (*Id*.). Claimant cared for her three small dogs, but she did not have to walk them as she had a fenced-in yard. (Tr. at 97). She could perform personal care, but she had trouble shaving her legs if she was "really hurting." (*Id*.).

Claimant estimated that she could stand for no more than 30 minutes at one time, walk for approximately 15 to 20 minutes, sit for 20 minutes, and lift approximately 10 to 20 pounds. (Tr. at 91). She stated that her medications sometimes made her tired and made it difficult to concentrate. (Tr. at 92). In particular, clonidine made her tired and dizzy—like she was wandering around "in a fog." (Tr. at 98-99). Claimant denied having diabetes, but she stated that she had been in the borderline range. (Tr. at 93). She affirmed that her blood pressure medication controlled her blood pressure, although that morning it was slightly high; her systolic number was around 130 when it should have been approximately 120. (*Id.*). In terms of mental impairments, Claimant stated that she saw Counselor Wilburn for symptoms of depression once or twice per month at Prestera Center. (Tr. at 93-94). Claimant was on four different anti-depressants, which helped control her anger, but she still did not like loud noises as they caused panic attacks. (Tr. at 94).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is

adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  Discussion

Claimant argues that the Commissioner's decision is flawed for four reasons: the ALJ failed to (1) properly develop the record; (2) assess her credibility regarding her pain and the side effects of her medication; (3) consider her impairments in combination; and (4) rebut the "presumption of disability." The issues are considered below, in turn.

### A.  Duty to Develop the Record

The ALJ is required to ensure that the record contains sufficient evidence upon which the ALJ can make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *see also Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D.W. Va. Sept. 30, 2009); *Jones v. Saul*, No. 1:19-cv-275-GCM, 2020 WL 2411635, at *3 (W.D.N.C. May 12, 2020). Consequently, when examining the record to determine if it is adequate to support a reasoned

administrative decision, the Court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

In this case, Claimant argues that the ALJ should have developed the record regarding three medical opinions. First, Claimant points to the opinion of the consultative examiner, Dr. Beard, who stated that, Claimant's "ability to perform physical work-related activities appear[ed] impaired for activities such as repetitive bending, squatting and medium to heavy lifting or carrying." (Tr. at 546). Claimant notes that Dr. Beard "failed to define the functional limitations for weight, or the frequency of the ability to perform these activities," and the ALJ should have sought clarification on those points. (ECF No. 12 at 9).

In assessing Claimant's RFC, the ALJ considered Dr. Beard's opinion and gave it some weight. (Tr. at 64). The ALJ explicitly noted that Dr. Beard did not define the weight limits that Claimant could lift or carry or the frequency with which Claimant could bend or squat. (*Id.*). However, the ALJ found that the evidence as a whole, including Dr. Beard's opinion,  supported a reduction to light work. (*Id.*). By way of explanation, the ALJ discussed Claimant's reported back and hip pain, citing Claimant's objective test results, physical examinations, and routine treatment consisting of injections and nerve blocks. (Tr. at 62-63). The ALJ remarked that, throughout the record, Claimant could stand and walk unassisted with a non-antalgic gait, and she remained neurologically intact with no weakness in her lower extremities. (*Id.*). Furthermore, the ALJ gave some weight to the opinions of the state agency physicians in his RFC assessment. (Tr. at 64). The ALJ disagreed with their conclusions that Claimant's physical impairments were non-severe, but agreed with their assessments that Claimant could perform work at the light exertional level with additional

limitations, including, *inter alia*, frequent bending and occasional crouching. (*Id.*); *see* (Tr. at 117-18, 148-49).

Based on the above, there were no inadequacies or gaps in the record that ALJ was obligated to develop with respect to Dr. Beard's opinion. The Transcript of the Administrative Proceedings contained the records of Claimant's clinical treatment; an internal medicine examination; opinions from non-examining medical sources; as well as Claimant's adult function reports, pain questionnaires, and testimony during Claimant's administrative hearing. Although Dr. Beard did not quantify the amount of weight that Claimant could lift or carry or the frequency with which Claimant could bend or squat, two state agency physicians, Dr. Lo and Dr. Boukhemis, reviewed Dr. Beard's examination findings and Claimant's other medical records, and they concluded that Claimant could perform work at the light exertional level with frequent bending and occasional crouching. Notably, these assessments were consistent with Dr. Beard's opinion that Claimant had a limited ability to bend or squat repetitively or lift or carry medium to heavy weight. The ALJ gave the state agency RFC assessments significant weight. Therefore, the record contained adequate information for the ALJ to evaluate Claimant's ability to lift, carry, bend, and crouch. There was no additional information that the ALJ needed from Dr. Beard in order to perform the function-by-function analysis and make an informed decision on Claimant's disability applications.

Next, Claimant argues that the ALJ should have developed the record regarding Dr. Lo and Dr. Boukhemis' opinions. They found that Claimant did not have any severe physical impairments, but they concluded that Claimant had the RFC to perform a reduced range of light work. Claimant indicates that the ALJ should have solicited further information from Dr. Lo and Dr. Boukhemis regarding which impairments

formed the basis of their RFC assessments, if they did not find any of the impairments to be severe.

The ALJ considered Dr. Lo and Dr. Boukhemis' opinions, but he found them to be internally inconsistent for the reason that Claimant identified: the physicians found non-severe impairments, but they nevertheless restricted Claimant's RFC to less than a full range of light work. (Tr. at 64). Thus, the ALJ gave the opinions only some weight. (*Id.*). The ALJ found that Claimant's degenerative disc disease and bursitis were severe impairments, but he agreed that the RFC restrictions that Dr. Lo and Dr. Boukhemis assessed were consistent with the evidence. (*Id.*).

Claimant does not challenge the ALJ's step two analysis regarding the severity of her impairments or the weight that the ALJ assigned to any of the medical opinions. Rather, she suggests that the ALJ needed more information from Dr. Lo and Dr. Boukhemis in order to properly evaluate their RFC assessments. However, Claimant does not identify any evidentiary gap that resulted in unfairness or prejudice to her. Dr. Lo and Dr. Boukhemis clearly identified the medical evidence that they considered in assessing Claimant's RFC, including Claimant's allegations, activities of daily living, treatment records, and consultative examination. (Tr. at 111-14, 140-45). In support of their assessments, they noted that Claimant was five feet and one inch tall, weighed 220 pounds, and had a body mass index of 41.6. (Tr. at 119, 149). They found that Claimant's morbid obesity was a significant contributing factor to her postural limitations. (*Id.*). Drs. Lo and Boukhemis acknowledged Claimant's allegations of back and hip pain and minimal range of motion loss in her lumbosacral spine, but they found that her range of motion in her hips and knees was unimpaired and her gait, motor strength, and neurological functions were intact. (*Id.*). Therefore, contrary to Claimant's assertion,

21

there was ample support for the ALJ to evaluate the RFC opinions of Dr. Lo and Dr. Boukhemis, and no further development of the record was necessary.

Based on the above, the undersigned **FINDS** that the record was sufficient for the ALJ to make an informed decision, and there were no inadequacies or evidentiary gaps in the record for which the ALJ was obligated to develop the evidence.

### B. Credibility and Medication Side Effects

In her second challenge to the Commissioner's decision, Claimant contends that the ALJ did not consider her pain and the side effects of her medication. In fact, Claimant contends that the ALJ entirely failed to analyze her subjective complaints. Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to

produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other

impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's

24

symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ clearly performed the two-step process. The ALJ considered Claimant's allegations that she could not work due to back and hip pain, which caused trouble sleeping and concentrating. (Tr. at 62). The ALJ further acknowledged Claimant's allegations that injections provided some initial relief, but the pain returned; chiropractic care and physical therapy did not ease her pain; and her medication made her drowsy. (*Id.*). The ALJ noted Claimant's statements that cold, damp weather aggravated her arthritis; she had to change positions due to pain; and she could only walk for 15 minutes at the most, sit for 20 minutes, and lift 10 to 20 pounds. (*Id.*). The ALJ also reviewed Claimant's allegations of anxiety, depression, and anger issues. (*Id.*). Ultimately, after considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but the ALJ found that Claimant's statements concerning the intensity, persistence, and

limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. (*Id.*).

The ALJ discussed that Claimant received routine treatment, which was generally successful in controlling her physical symptoms; her x-rays and MRI showed no more than moderate issues; she could stand and walk unassisted with a non-antalgic gait; her physical examination findings generally indicated no issues with her lower extremities or neurological deficits; her mental status examinations were normal overall; and she was stable on medications for her mental impairments. (Tr. at 62-63). The ALJ also remarked that Claimant reported in June 2018 that her most recent injections provided 90 percent pain relief. (Tr. at 62). In addition, the ALJ considered Claimant's daily activities, remarking that Claimant used public transportation, drove short distances, shopped, went out alone, prepared simple meals, did light household chores, managed her personal grooming and hygiene independently, watched television, and cared for pets. (Tr. at 60-61). The ALJ also considered the opinion evidence. (Tr. at 64).

Contrary to Claimant's arguments, the ALJ very clearly analyzed all of the relevant evidence, including the categories of evidence referenced in 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3). The ALJ specifically discussed the objective medical findings, opinion evidence, and Claimant's daily activities, description of symptoms, medical treatment, side effects of medication, and alleged functional limitations. The ALJ explicitly referenced the evidence that Claimant claims the ALJ failed to address, including Claimant's allegation that injections provided initial relief, but the pain returned, and her statements that her medication made her drowsy.

The ALJ's foregoing credibility analysis is supported by substantial evidence. Claimant alleged disability beginning in December 2015. She reported back and hip

pain, and she frequently stated that injections provided no relief or short-term relief. (Tr. at 566, 568, 613, 646, 674). However, at other times, Claimant reported significant improvement from treatment, including stating in December 2015 that injections provided four to six months of relief; in April 2017 that radiofrequency provided pain relief; in May 2017 that she had 60 percent pain relief from hip joint injections; in March 2018 that she received greater than 50 percent pain relief for a few months after sacroiliac joint injections; and in June 2018 that trochanteric bursa injections provided 90 percent pain relief. (Tr. at 89, 658, 669, 719, 729). In addition, Claimant maintained normal muscle strength, sensation, reflexes, gait, and stance throughout the record. (Tr. at 24, 433, 565, 569, 604, 628, 668, 719, 723). She worked during the relevant period; she stated that treatment was helpful; none of the objective testing documented any severe findings; and her providers continued to recommend only injections, nerve blocks, radiofrequency treatments, medication, and physical therapy. (Tr. at 24, 47-50, 429, 566, 570, 604, 605, 620, 629, 646, 658, 674, 669, 719, 724, 729). None of Claimant's providers suggested surgery or more aggressive treatments to control her symptoms.

Therefore, there is more than a scintilla of evidence to support the ALJ's analysis of Claimant's subjective symptoms, medication side effects, and pain. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's analysis of Claimant's credibility.

### C. Combination of Impairments

Claimant next contends that the ALJ did not properly consider her combination of impairments. An ALJ must consider the combined, synergistic effect of all of a

claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on the claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). The relevant regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the United States Court of Appeals for the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

In this case, Claimant cites the foregoing legal standard, but does not elaborate on how the ALJ failed to fulfill this obligation in the present case. The ALJ thoroughly considered Claimant's mental and physical impairments, discussing Claimant's allegations, the objective evidence, and the opinions offered in this matter. (Tr. at 59-

64). The decision clearly articulates the ALJ's well-supported rationale for finding that Claimant's impairments, alone or in combination, did not preclude her from engaging in substantial gainful activity. (*Id*.). To the extent that the ALJ did not elaborate further on the analysis of Claimant's impairments in combination, the undersigned finds further elaboration to be unnecessary, because the required analysis clearly took place. Therefore, the undersigned **FINDS** that the ALJ complied with her duty under the applicable law to consider Claimant's impairments in combination.

### D. Presumption of Disability

In her final challenge to the Commissioner's decision, Claimant contends that the ALJ failed to produce evidence sufficient to rebut the presumption of disability. Claimant indicates that the evidence was "overwhelming" in her favor, and the ALJ failed to rebut it. (ECF No. 12 at 13). However, there is no "presumption of disability" under the Social Security Act, as Claimant suggests. A claimant is ultimately responsible for proving that he or she is disabled, and that responsibility never shifts to the Commissioner. To the extent that Claimant argues that the Court should independently reevaluate Claimant's case, and reach different conclusions than the ALJ, such contention is without any legal basis.

It is possible that Claimant refers to the fifth and final step of the sequential analysis. When a claimant proves the existence of severe impairments that prevent the performance of past relevant work at the fourth step of the sequential disability evaluation, the claimant has established a *prima facie* case of disability. The burden of production then shifts to the Commissioner to provide evidence demonstrating that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work

experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), which "take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 404.1569. However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform. *Id.* For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* In those cases, the ALJ must prove the availability of jobs through the testimony of a vocational expert. *Id.* As a corollary to this requirement, however, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant so long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. *See Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

In the present case, the ALJ determined that Claimant could not perform any past relevant work, so the ALJ relied on the testimony of a vocational expert to determine whether Claimant was capable of performing other substantial gainful employment. (Tr. at 64-66). The ALJ asked the vocational expert if there were any jobs in the national economy that could be performed by someone with Claimant's characteristics and RFC, and the vocational expert responded that such individual could work as a routing clerk, office helper, table worker, or sorter. (Tr. at 66, 106-07). Therefore, the undersigned **FINDS** that the ALJ's determination that there were jobs in the national economy that Claimant could perform, and consequently that Claimant was not disabled under the Social Security Act, was supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF Nos. 12); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 16); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to

file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: July 17, 2020

Cheryl A. Eifert
United States Magistrate Judge